## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| | : | |
| v. | : | Hon. Madeline Cox Arleo |
| | : | |
| ROBERT RAMNARINE | : | Case No.: 12-8121 |

I, Stephanie Davis, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Stephanie Davis, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

August 1, 2012          at
Date

HONORABLE MADELINE COX ARLEO
United States Magistrate Judge
Name & Title of Judicial
Officer

Newark, New Jersey
City and State

Signature of Judicial Officer

## ATTACHMENT A

### Counts 1 through 3
### (Securities Fraud – Insider Trading)

On or about the dates set forth below, in the District of New Jersey and elsewhere, defendant

## ROBERT RAMNARINE

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases and sales of securities by (a) employing devices, schemes, and artifices to defraud members of the investing public; and (b) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon persons, in that defendant RAMNARINE executed and caused the execution of the securities transactions listed below based upon material, nonpublic information that defendant RAMNARINE obtained through his employment at Bristol-Myers Squibb Company:

| COUNT | APPROXIMATE DATES | SECURITIES TRANSACTIONS |
|---|---|---|
| 1 | August 25, 2010 through September 8, 2010 | Purchase and sale of approximately 80 call options in ZymoGenetics, Inc. stock |
| 2 | November 8, 2011 through November 21, 2011 | Purchase and sale of approximately 59 call options of Pharmasset, Inc. stock |
| 3 | May 24, 2012 through July 2, 2012 | Purchase and sale of approximately 710 put options and 130 call options in Amylin Pharmaceuticals, Inc. stock |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

## ATTACHMENT B

I, Stephanie Davis, have been a Special Agent of the Federal Bureau of Investigation ("FBI") for over a year and half, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of relevant facts; b) my review of publicly available information relating to Bristol-Myers Squibb Company, ZymoGenetics, Inc., Pharmasset, Inc., and Amylin Pharmaceuticals, Inc.; and c) documents, including brokerage records and business records obtained from various entities. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## INTRODUCTION

1.      As set forth in more detail below, there is probable cause to believe that defendant ROBERT RAMNARINE, in violation of his fiduciary duties and duties of trust and confidence to his employer, Bristol-Myers Squibb Company ("BMS"), traded on material, nonpublic information regarding BMS's anticipated acquisitions of certain publicly traded companies (the "BMS Acquisition Targets") . This information enabled defendant RAMNARINE to reap substantial profits by engaging in lucrative trading in stock options of the BMS Acquisition Targets shortly before they were either acquired by BMS or another company, and before the BMS Acquisition Targets' stock prices increased in value. Between in or about August 2010 and in or about June 2012, defendant RAMNARINE generated approximately $311,361 in illicit profits pursuant to this scheme.

## RELEVANT PARTIES AND ENTITIES

2.      At all times relevant to this Complaint unless otherwise indicated:

        a.      Bristol-Myers Squibb Company or "BMS" was a global pharmaceuticals company with offices in Princeton, New Jersey, Plainsboro Township, New Jersey, and New Brunswick, New Jersey, among other locations. BMS's key products included Plavix, Abilify, and Reyataz, and its net sales exceeded $21 billion in 2011. BMS's stock was registered with the U.S. Securities and Exchange Commission, and traded on the New York Stock Exchange under the symbol "BMY".

        b.      Defendant RAMNARINE, a resident of East Brunswick, New Jersey, was employed by BMS beginning in or about December 1997. From in or about March 2008 through in or about June 2011, defendant RAMNARINE served as BMS's Director of Pensions and Savings Investments, working at BMS's Princeton, New Jersey office. In or about June 2011, defendant RAMNARINE was promoted to BMS's Executive Director of Pensions and Savings

1

Investments, also in BMS's Princeton, New Jersey office. In both of those positions, defendant RAMNARINE had responsibility for, among other things, BMS's pension and savings plans, including investments made by BMS's pension plans. In addition, defendant RAMNARINE was responsible for conducting due diligence concerning the pension and savings plans of BMS Acquisition Targets. In or about July 2012, defendant RAMNARINE was promoted to BMS's Assistant Treasurer for Capital Markets, and continued to work in BMS's Princeton, New Jersey office. In that capacity, defendant RAMNARINE was responsible for, among other things, evaluating BMS's strategic investments, raising capital for such investments, and interacting with credit agencies. From at least in or about March 2008 to the present, defendant RAMNARINE was a high-level executive at BMS, and was involved in evaluating potential BMS Acquisition Targets, including publicly traded companies. As such, he was privy to inside company information concerning such transactions, as well as inside company information of BMS's Acquisition Targets, namely the fact that the targets were looking to be acquired. RAMNARINE had a duty not to disclose confidential information and material, nonpublic information he learned through his employment with BMS, or to use such information for his personal benefit or the benefit of others.

c.      ZymoGenentics, Inc. was a biotechnology and pharmaceutical company based in Seattle, Washington, and was engaged in the business of developing, manufacturing and marketing therapeutic proteins. From approximately in or about 2000 through in or about October 2010, ZymoGenetics stock was registered with the U.S. Securities and Exchange Commission, and was listed on the NASDAQ stock exchange under the ticker symbol "ZGEN".

d.      Pharmasset, Inc. was a pharmaceutical company based in Princeton, New Jersey, and was engaged in the business of developing, manufacturing and marketing antiviral drugs. From in or about April 2007 through in or about January 2012, the stock of Pharmasset was registered with the U.S. Securities and Exchange Commission, and was listed on the NASDAQ stock exchange under the ticker symbol "VRUS".

e.      Amylin Pharmaceuticals, Inc. was a pharmaceuticals company based in San Diego, California, and was engaged in the business of developing, manufacturing and marketing of drugs for the treatment of diabetes, obesity, and other diseases. Amylin's stock was registered with the U.S. Securities and Exchange Commission, and was listed on the NASDAQ stock exchange under the ticker symbol "AMLN".

## BMS's Policies Concerning Insider Trading

3.      At all times relevant to this Complaint, BMS had policies in place, which expressly informed BMS employees about the legal prohibitions against "insider trading," and warned BMS employees of the criminal penalties for such conduct. These policies were communicated to defendant RAMNARINE on multiple occasions during his employment at BMS, including through on-line training modules which he completed on numerous occasions, for example, on or about April 27, 2010, March 1, 2011, and March 30, 2012.

4.     For example, BMS's Corporate Policy on Securities Trading effective March 15, 2010, included the following provisions:

a.     "This Policy is intended to provide individuals trading in securities a general understanding of [United States] securities laws to prevent unintentional as well as intentional violations of these laws."

b.     "The BMS Standards of Business Conduct and Ethics and United States Securities laws prohibit trading in the securities of BMS or any other companies while in possession of material, non-public information of such company, as well as providing material non-public information to others who trade on that information. These types of transactions are commonly known as 'insider trading,' and 'tipping' respectively. The laws that correspond to this Policy are intended to ensure that everyone trading in securities in the marketplace has fair and equal access to material information about the issue of the securities."

c.     "Information is 'material' if its disclosure could reasonably have an effect on the price of a company's securities or is likely to be considered important by a reasonable investor in determining whether to buy, sell or hold such securities. Common examples of information that will be frequently regarded as material include... significant mergers, acquisitions, alliances or divestitures.... and any other information which could result in substantial market share and/or revenue gains or losses."

d.     "Information should be considered 'non-public' if it has not been disseminated in a manner making it available to investors generally, such as through disclosure in a company's annual report..., inclusion in a press release, or otherwise widely reported in the media, and investors have had a reasonable period of time to react to the information."

e.     "Those who have material, non-public information relating to BMS or another company (such as customer, supplier, other business partner, or potential business partner), are prohibited from buying or selling securities of BMS or the other company, or engaging in any other action to take advantage of, or pass that information to others ("tipping")."

f.     "The consequences for insider trading violations can be severe.... Individuals who violate the law may face.... a criminal fine (no matter how small the profit) of upto $5 million; and a jail term of up to twenty years."

5.     In late 2011, a BMS issued a revised Corporate Policy on Securities Trading effective February 17, 2012, which generally tracked the prior policy with respect to the provisions outlined above.

## BMS's Acquisition of ZymoGenetics and defendant RAMNARINE's Insider Trading

6.      Beginning in or about May 2010, BMS entered into discussions to acquire ZymoGenetics. These discussions continued through August 2010. On or about August 12, 2010, BMS reached a tentative agreement with ZymoGenetics to purchase the company for $9.27 per share in cash, pending approval by BMS's Board of Directors.

7.      Between in or about August 12, 2010 and in or about September 4, 2010, BMS conducted due diligence of ZymoGenetics. In or about August 2010, through the course of his employment at BMS, defendant RAMNARINE learned of BMS's plans to acquire ZymoGenetics.

8.      On or about September 7, 2010, BMS publicly announced that it had entered into an agreement with ZymoGenetics to acquire the company for approximately $885 million, or $9.75 per share, in cash. The acquisition was completed in or about October 2010.

9.      Prior to the September 7, 2010 public announcement of BMS's acquisition of ZymoGenetics, however, defendant RAMNARINE purchased ZymoGenetics options[1], all of which he sold the day after the public announcement.

10.     These trades included the following, were made through his personal brokerage account at Fidelity Investments:

| Option Series | Quantity | Buy Date(s) | Avg. Buy Price | Sell Date | Sell Price | Profit |
|---|---|---|---|---|---|---|
| ZGEN October 2010 $5 Calls | 45 | 8/25/10 - 8/26/10 | $0.54 | 9/8/10 | $4.70 | $18,585 |

11.     In addition, on or about August 27, 2010, defendant RAMNARINE attempted to purchase additional ZymoGenetics call options through another brokerage account that he maintained at Scottrade, Inc. ("Scottrade"), but could not do so as the account was not authorized to trade in options. As a result, on that same date, defendant RAMNARINE obtained authorization to trade options in his Scottrade account by completing an Options Application and Agreement ("Scottrade Application"). The Scottrade Application falsely stated that defendant

---

[1] An "option" is an instrument that gives the owner the right to buy or sell a specified number of shares of a specified stock at a certain price within a specified period. A "call" option allows the option holder to buy the underlying stock at a set price at any time up to the expiration date of the contact; a "put" option allows the option holder to sell the underlying stock at a set price at any time before the contract expires. An option is a security and is subject to the same regulatory scheme that governs trading in other forms of securities.

RAMNARINE worked at Merck & Co., rather than BMS where he had worked since 1997. Thereafter, defendant RAMNARINE made the following trades in his Scottrade account ahead of the September 7, 2010 public announcement:

| Option Series | Quantity | Buy Date(s) | Avg. Buy Price | Sell Date | Sell Price | Profit |
|---|---|---|---|---|---|---|
| ZGEN February 2011 $5 Calls | 35 | 9/3/10 - 9/7/10 | $1.25 | 9/8/10 | $4.70 | $11,966 |

12.     In total, defendant RAMNARINE earned approximately $30,551 in illicit profits from trading on the insider information he possessed concerning BMS's acquisition of ZymoGenetics.

**BMS's Discussions with Pharmasset and defendant RAMNARINE's Insider Trading**

13.     In or about September 2011, Gilead Sciences, Inc., a publicly traded company whose stock was traded on the NASDAQ stock exchange under the ticker symbol "GILD", made an offered to acquire Pharmasset for $100 per share in cash. In or about October 2011, Gilead increased its offer to $125 per share in cash.

14.     Thereafter, Pharmasset solicited offers through its investment banking firm, Morgan Stanley, from a number of other pharmaceutical companies including BMS. On or about October 12, 2011, Morgan Stanley informed BMS that Pharmasset was engaged in a "limited auction process" after soliciting an unsolicited acquisition offer, and that November 17, 2011 was the deadline for BMS and other prospective purchasers to submit offers for Pharmasset.

15.     Between in or about October 13, 2011 through in or about November 18, 2011, BMS engaged in discussions with Pharmasset concerning BMS's potential acquisition of the company. On or about November 1, 2011, defendant RAMNARINE participated in a meeting at BMS's Princeton, New Jersey office, during which he was informed that Pharmasset was engaged in a confidential auction process, whereby it was seeking to be acquired by the highest suitor by November 17, 2011. Defendant RAMNARINE was subsequently tasked with conducting due diligence concerning BMS's potential acquisition of Pharmasset.

16.     On or about November 17, 2011, however, BMS withdrew from discussions with Pharmasset. Ultimately, on or about November 21, 2011, Gilead announced that it had entered into an agreement with Pharmasset to acquire the company for approximately $11 billion, or $137 per share, in cash. The purchase price represented an approximately 89% premium over the Pharmasset's closing price on November 18, 2011. The acquisition was completed in or about January 2012.

5

17.    Prior to the November 21, 2011 public announcement of BMS's acquisition of Pharmasset, however, defendant RAMNARINE purchased Pharmasset options all of which he sold following the public announcement.  These trades included the following, among others:

| Option Series | Quantity | Buy Date(s) | Avg. Buy Price | Sell Date | Sell Price | Profit |
|---|---|---|---|---|---|---|
| VRUS December 2011 $85 Calls | 10 | 11/8/11 | $1.50 | 11/21/11 | $49.60 | $48,068 |
| VRUS February 2012 $100 Calls | 19 | 11/8/11-11/9/11 | $1.88 | 11/21/11 | $35.30 | $63,436 |
| VRUS December 2011 $90 Calls | 10 | 11/17/11 | $0.40 | 11/21/11 | $44.80 | $44,368 |
| VRUS December 2011 $100 calls | 20 | 11/17/11 | $0.20 | 11/21/11 | $34.80 | $69,155 |

18.    Notably, defendant RAMNARINE made the November 17, 2011 options purchases described above from his office at BMS using his work-issued Blackberry.

19.    Defendant RAMNARINE earned approximately $225,026 in illicit profits from trading on the insider information he possessed concerning BMS's acquisition of Pharmasset.

**Defendant RAMNARINE's Attempts to Conceal His Illegal Conduct**

20.    Between on or about November 2, 2011 and in or about November 3, 2011, prior to the Pharmasset options purchases described above, defendant RAMNARINE conducted a number of Internet searches using Yahoo! from his Princeton, New Jersey office.  These searches concerned means to avoid detection for insider trading and included the following:

a.    At approximately 8:46 a.m., on or about November 2, 2011, defendant RAMNARINE searched the following terms: "can option be traced to purchaser."

b.    At approximately 9:01 a.m., on or about November 2, 2011, defendant RAMNARINE searched the following terms: "can stock option be traced to purchase inside trading."

c.    At approximately 9:33 a.m., on or about on November 3, 2011, defendant RAMNARINE searched the following terms: "insider trading options traceillegal [*sic*]."

21.    Based on the above Yahoo! searches, as well as others, between in or about November 2, 2011 and in or about November 3, 2011 defendant RAMNARINE visited a number of websites and viewed a number of articles discussing the purpose of insider trading laws, examples of insider trading violations, as well as ways to avoid insider trading violations. For example:

a.    At approximately 9:19 a.m., on or about November 3, 2011, defendant RAMNARINE reviewed an article at www.zerohedge.com dated February 2, 2010 and titled "Obvious Insider Trading in Ann Taylor Options Ahead of Earnings." The article discussed "highly abnormal" trading patterns in Ann Taylor options, which the article attributed to possible insider trading ahead of an upcoming earnings announcement.

b.    At approximately 9:34 a.m., on or about November 3, 2011, defendant RAMNARINE reviewed a press release available on the website of the U.S. Securities and Exchange Commission titled "SEC Charges Eight More in Reebok Insider Trading Case." The press release related to an August 2005 civil action filed by the SEC against individuals who engaged in, among other things, options trading based on insider information concerning Reebok.

## BMS's Acquisition of ZymoGenetics and defendant RAMNARINE's Insider Trading

22.    On or about February 15, 2012, BMS made an offer to acquire all of Amlyin's outstanding stock for $22 per share. On or about March 6, 2012, Amylin rejected BMS's offer. On or about April 23, 2012, however, Amylin contacted BMS to determine if BMS was interested in participating in an auction to purchase Amylin. Thereafter, on or about May 8, 2012, BMS decided to participate in the auction process and entered into a confidentiality agreement with Amylin.

23.    Between in or about April 2012 and in or about May 2012, defendant RAMNARINE, who was in the process of transitioning to his new position as Assistant Treasurer for Capital Markets, was tasked with conducting due diligence related to BMS's potential acquisition of Amylin. Specifically, defendant RAMNARINE was responsible for advising BMS on matters relating to capital structure and cash flow planning for the transaction, as well a communicating with credit rating agencies concerning the potential impact the Amylin transaction could have on BMS's credit rating. In his new capacity, defendant RAMNARINE participated in meetings and conference calls with BMS's investment bankers, Citigroup, Inc., and with credit agencies concerning the potential acquisition.

7

24.     On or about May 24, 2012, BMS submitted a preliminary offer to acquire Amylin for $25-$27 per share.  Subsequently, on or about June 27, 2012, BMS submitted a revised offer to purchase Amylin for $31 per share in cash.

25.     On or about June 29, 2012, BMS publicly announced that it that it had entered into an agreement with Amylin to acquire the company for approximately $7 billion, or $31 per share, in cash.  The purchase price represented an approximately 10% premium over Amylin's closing price on June 29, 2012.

26.     Prior to the June 29, 2012 public announcement of BMS's acquisition of Amylin and during the course of performing due diligence, defendant RAMNARINE purchased Amylin options all of which he sold following the public announcement.  These trades included the following, among others:

| Option Series | Quantity | Write/ Buy Date(s) | Avg. Write/Buy Price | Cover/ Sell Date | Cover/ Sell Price | Profit |
|---|---|---|---|---|---|---|
| AMLN July 2012 $21 Puts | 100 | 5/24/12 | $1.92 | 5/29/12 | $0.59 | $13,132 |
| AMLN July 2012 $20 Puts | 100 | 5/24/12 | $1.55 | 5/29/12 | $0.53 | $10,072 |
| AMLN July 2012 $22 Puts | 100 | 5/29/12 | $0.85 | 5/29/12 | $0.73 | $1,032 |
| AMLN July 2012 $22 Puts | 200 | 6/11/12 | $0.95 | 6/12/12 | $0.93 | $80 |
| AMLN July 2012 $25 Puts | 210 | 6/18/12-6/21/12 | $1.10 | 7/2/12 | $0.03 | $22,141 |
| AMLN July 2012 $30 Calls | 30 | 6/26/12 | $0.41 | 6/29/12 | $0.65 | $658 |
| AMLN July 2012 $28 Calls | 50 | 6/27/12-6/29/12 | $1.60 | 7/2/12 | $2.73 | $5,550 |
| AMLN July 2012 $29 Calls | 50 | 6/29/12 | $1.09 | 7/2/12 | $1.74 | $3,119 |

27.     Defendant RAMNARINE earned approximately $55,784 in illicit profits from trading on the insider information he possessed concerning BMS's acquisition of Amylin.